1
2
3
4                          **UNITED STATES DISTRICT COURT**
5                               **DISTRICT OF NEVADA**
6
7    UNITED STATES OF AMERICA,              )
8                        Plaintiff,          )          Case No.  2:16-cr-00142-APG-CWH
                                            )
9    vs.                                     )          **REPORT & RECOMMENDATION**
                                            )
10   JOSE CARLOS JIMENEZ,                    )
                                            )
11                       Defendant.          )
     _____     )
12
13          Presently before the court is Defendant Jose Carlos Jimenez's Motion to Suppress (ECF No.
14   18), filed on July 18, 2016, and the Government's Response (ECF No. 20), filed August 2, 2016,
15   and Jimenez's Reply (ECF No. 22), filed August 8, 2016.  The Court conducted an evidentiary
16   hearing on August 9, 2016.  (Minutes (ECF No. 23).)  Jimenez filed a Supplement to Motion to
17   Suppress (ECF No. 26) on September 2, 2016, and the Government filed an Opposition to
18   Defendant's Supplement to Motion to Suppress (ECF No. 31), on September 16, 2016.  Jimenez
19   filed a Reply (ECF No. 33) on September 23, 2016.  The Court conducted an additional hearing on
20   September 29, 2016.  (Minutes (ECF No. 35).)  Trial is scheduled for October 31, 2016.
21                          **I.  FACTS AND PROCEDURAL HISTORY**
22          On April 15, 2016, Las Vegas Metropolitan Police Department Detective Donaldson, a
23   nine-year veteran, learned that a confidential source ("CS"), someone he had known for about four
24   months, could purchase eight pounds of methamphetamine from a person named "Jose."  The CS
25   was a person who was pending charges and was hoping to obtain a benefit by assisting law
26   enforcement.  The CS and Jose had apparently been in communication for several weeks.
27   Detective Donaldson testified that the CS advised him that Jose was coming to Las Vegas from
28   California to deliver eight to ten pounds of methamphetamine, and possibly some heroin.  The

information provided by the CS was not specific, and Jose's full identity was not known to the CS. Detective Donaldson believed, based upon his investigation on Facebook, that the suspect was named Jose C.,[1] but the CS was not 100% sure that was correct.  On April 16, 2016, the CS and Jose were reportedly in contact by telephone.  The calls were not recorded, Detective Donaldson was not aware of the telephone number being called or calling in, and he did not hear the conversations.  Detective Donaldson testified that he witnessed the CS speaking directly with a person represented by the CS to be Jose regarding the delivery of the drugs that day.  The CS and Jose reportedly agreed to meet at 7:00 p.m. at 195 East Tropicana in the parking lot of the Motel 6.

Based on the reported conversations between the CS and Jose, at about 5:00 p.m., Detective Donaldson and other members of law enforcement set up surveillance from the upper level of the MGM Parking lot looking south across Tropicana Avenue towards the parking lot.  The area being observed was a large, mostly vacant parking place also near a Coco's restaurant.  As they waited, Jose called the CS several times and advised that, because of traffic, he was running late.  At about midnight, in order to give the CS an opportunity to make a positive identification of Jose when he arrived, Detective Donaldson and the CS changed location by moving across the street to the parking lot.  Detective Donaldson testified that after they moved to the parking lot, Jose called the CS and told him that he would be arriving on foot, had the narcotics in a bag, and he was wearing a red shirt.  Jose told the CS that he was about 5'11" tall and about 220 pounds, with shorter dark brown hair.

Detective Donaldson testified that at 12:40 a.m. on April 17, 2016, he observed an Hispanic man, later determined to be Jimenez, walking east-bound on Tropicana Avenue towards the parking lot.  Jimenez was wearing a red polo shirt and black jeans, and carrying a black duffle bag. Detective Donaldson noticed that Jimenez entered the parking lot and paced back and forth in the parking lot.  He testified that Jimenez appeared nervous by continually looking around as if he were being followed or watched, and by adjusting his bag.

---

[1] The suspected name is redacted as unnecessary to the resolution of this matter because it turned out that the identity was incorrect.

After about five minutes, Detective Donaldson saw Jimenez place a call on his cell phone and noted that at the same time, the CS's phone rang.  The CS confirmed to Detective Donaldson that it was Jose on the phone, and then told Jose he was "hung up."  Within one or two minutes after the call, Jimenez started walking back towards Tropicana Avenue in the direction from which he had come.  Detective Donaldson directed marked patrol cars, who were part of the on-going surveillance operation, to approach Jimenez, advising them to: "Just keep it super chilly.  Consensual stop.  Say no trespassing.  And ask anything illegal on you."  When the patrol cars appeared, Jimenez started to run.  Jimenez was taken into custody by Metro Officer Clutterbuck after a short foot pursuit.  Jimenez was immediately asked if he had any weapons, and if there was anything that the Officer needed to know about, and Jimenez indicated he had some marijuana and cocaine in his pockets.  The officers seized the marijuana and cocaine, and searched the black bag, finding and seizing 9.7 pounds of methamphetamine and some heroin.  Jimenez was transported to Clark County Detention Center where Detective Donaldson advised him of his *Miranda* rights.  Jimenez stated that he understood his rights and agreed to speak with Detective Donaldson.  On cross examination, after first denying he did so, Detective Donaldson recalled that several weeks after Jimenez was arrested, he used the phone seized from Jimenez to call 911 in order to learn its service carrier and telephone number.

Las Vegas Metropolitan Police Officer Edward Clatterbuck was assigned to assist in the surveillance operation with Detective Donaldson on the evening of April 16, 2016, and around midnight was aware that he was looking for an Hispanic male wearing a red shirt, possibly named Jose, who would be in possession of narcotics.  He testified that he believed that he was made aware of those details at the operations plan brief conducted by Detective Donaldson at about 5 p.m. earlier that day.  Officer Clatterbuck testified that at about 12:40 a.m., when he began to approach Jimenez as directed by Detective Donaldson, Jimenez began to run.  Officer Clatterbuck chased Jimenez, knocked him down, took him into custody, and placed him in handcuffs.  About four or five other officers were present.  Upon taking him into custody, Officer Clatterback asked Jimenez whether he had anything in his possession which he should not have, and Jimenez indicated he had marijuana and cocaine in his pockets.  Officer Clutterbuck testified that Jimenez

1  was under arrest for trespassing and for "obstructing" by fleeing, and never advised Jimenez of his

2  *Miranda* rights.

3       Las Vegas Metropolitan Police Detective Jeffrey Kinsler testified he was assigned to assist

4  in the surveillance operation with Detective Donaldson on the evening of April 16, 2016.  By about

5  12:40 a.m., he believed he was looking for an Hispanic male wearing a red polo shirt.  At about that

6  time, Detective Kinsler saw Jimenez, who matched the description broadcast by Detective

7  Donaldson.  It appeared to Detective Kinsler that Jimenez was making telephone calls because he

8  could see the light on the phone as it was held by Jimenez.  Detective Kinsler advised Detective

9  Donaldson of Jimenez's presence, and he heard Detective Donaldson tell the patrol officers to

10  make contact with Jimenez.  Detective Kinsler saw Jimenez running away and the officers take him

11  into custody.

12       On May 11, 2016, the government filed an indictment against Jimenez, alleging Conspiracy

13  to Distribute a Controlled Substance under 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A)(viii) (Count

14  1), and Possession with Intent to Distribute Methamphetamine under 21 U.S.C. § 841(a)(1),

15  (b)(1)(A)(viii) (Count 2).  (Indictment (ECF No. 1).)  Jimenez moves to suppress all statements

16  made and all drugs seized.

17                                   **II.  DISCUSSION**

18       **A.  Applicable Law**

19       In his motion to suppress, Jimenez argues that law enforcement had neither a warrant nor

20  probable cause to arrest him, and therefore the evidence seized as the result of that illegal arrest

21  should be suppressed.  The Government responds that the officers had reasonable suspicion to

22  investigate Jimenez, and that when he attempted to flee, coupled with reasonable suspicion which

23  existed at the time, probable cause for the arrest was established.  The Government further argues

24  that the evidence was lawfully seized incident to Jimenez's arrest.

25       The Fourth Amendment addresses "the right of the people to be secure in their persons,

26  houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. Amend. IV.

27  The Fourth Amendment protects reasonable and legitimate expectations of privacy.  *Katz v. United*

28  *States*, 389 U.S. 347 (1967).  It protects "people, not places."  *Id*. at 351.  Evidence obtained in

4

violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

The Supreme Court has long held that police may stop a citizen at any time, ask for identification and other information, and even request permission to search so long as a reasonable person in the citizen's position would recognize that he or she is free to leave or terminate the encounter. *See generally  Terry v. Ohio*, 392 U.S. 1 (1968); *Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Rodriguez*, 469 U.S. 1(1984).  Indeed, police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions because "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

An investigatory detention under the Fourth Amendment must be supported by "reasonable suspicion" that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  In assessing whether an officer has reasonable suspicion to conduct an investigatory detention, reviewing courts look at the "totality of the circumstances" of each case to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. *Id*.  "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Sigmond-Ballasteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citing *Arvizu*, 534 U.S. at 273).

A reviewing court's determination of reasonable suspicion is a process that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 418).  The Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot and observation of factors which are by themselves consistent with innocence, but may collectively amount to reasonable suspicion. *Id*. at 273-74.  Reasonable suspicion is not a matter of hard certainties, but of probabilities. *Cortez*, 449 U.S. at 417-18.  However, reasonable suspicion requires more than an officer's "hunch" even if the hunch later turns out to be a good one. *Terry*,

392 U.S. at 27.  The reasonable suspicion standard is less than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause.  *Maryland v. Pringle*, 540 US 366, 370 (2003); *see also, Atwater v. Lago Vista*, 532 US 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")  "Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime."  *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (internal quotation marks and citations omitted).  Absent probable cause, a warrantless arrest is illegal.  *Id*.  Police officers may rely on the totality of facts available to them when determining whether probable cause exists to make an arrest.  *See United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989) (officers' experience and expertise) (overruled on other grounds by *U.S. v. Ruiz*, 257 F.3d 1030 (9th Cir. 2001)); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (nature of the area); *United States v. Koshnevis*, 979 F.2d 691, 695 (9th Cir. 1992) (suspect's contradicting himself and nervousness were a part of the probable cause determination).

The Supreme Court has held that a person's "headlong," "unprovoked" flight upon seeing a police officer, when it occurs in a high-crime neighborhood, is sufficient to establish reasonable suspicion that the person is involved in criminal activity.  *Wardlow*, 528 U.S. at 124-25.  "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."  *Id*. at 124.  Flight, together with other evidence, gives rise to probable cause.  *United States v. Smith*, 633 F.3d 889, 894 (9th Cir. 2011).

When a confidential source is involved, the reliability of both the informant and the information provided must be considered—an informant's veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report.  *Illinois v. Gates*, 462 U.S. 213, 230 (1983).  The police's ability to corroborate a confidential source's information is critical.

1   *Id.* at 241-242.  Courts consider the totality of the circumstances when assessing whether a

2   confidential source's information provided a constitutionally sufficient justification for a search or

3   seizure.  *Id.* at 230-231.  The Court should look at the following factors to determine the reliability

4   of an informant's tip: (1) a known informant's tip is thought to be more reliable than an anonymous

5   informant's tip; (2) informant with a proven track record of reliability is considered more reliable

6   than an unproven informant; (3) an informant is considered more reliable if the informant reveals

7   how the informant came to know the information; and (4) a tip that provides information about

8   future events that is corroborated by police observation may be considered reliable.  *United States*

9   *v. Rowland*, 464 F.3d 899, 907-908 (9th Cir. 2006)

10          **B.  Probable Cause to Arrest**

11          Jimenez argues that the CS's information failed to establish either probable cause or

12   reasonable suspicion.  Jimenez notes that the planned drug deal was, according to Detective

13   Donaldson, nondescript with very little detail.  Jimenez's true identity was uncertain in spite of the

14   Facebook investigation Detective Donaldson had conducted, and Jimenez withheld his physical

15   description from the CS until just prior to arriving at the parking lot.  Jimenez argues that Detective

16   Donaldson did nothing to corroborate "Jose's" identity, was not present or listening to all the calls

17   made with the CS, did not record any of the calls, and did not record Jose's telephone number on

18   the CS's telephone.  Detective Donaldson relied solely on the representations of the CS, a person

19   who was pending possible charges against him, and who had never previously assisted the

20   Detective.  Jimenez argues that his actions in the parking lot were like those of other tourists in the

21   same area, and so it was not reasonable to believe that he was engaged in criminal activity.  The

22   Government argues that the CS provided reliable and credible information to support a finding of

23   reasonable suspicion to believe that Jimenez had brought drugs for sale to the vacant lot, and that

24   his attempt to flee established probable cause for the arrest.

25          Here, when the officers approached Jimenez in the parking lot, they reasonably believed

26   that the CS had earlier made an agreement to purchase eight to ten pounds of methamphetamine

27   from him that day.  The CS's identity was known, and he accompanied the officers on the

28   surveillance operation.  He could therefore be held accountable if he provided false information,

7

making his information more reliable. *See Adams v. Williams*, 407 U.S. 143, 146 (U.S. 1972). The CS reported information about "Jose" was based upon his personal telephone conversations, making his first hand information more reliable. While it is true that the CS had no track record of providing information in the past, the CS was able to predict information that the police were able to corroborate. The CS had reported multiple calls with Jimenez indicating when and where they would meet, and he did eventually arrive at the parking lot, and on foot, as predicted by the CS. Jimenez arrived at a time when he said he would be there (after the traffic delay), and matched the physical description as to height, weight, being Hispanic, and wearing a red shirt, as anticipated and reported by the CS. Jimenez was also carrying a bag, which is consistent with both the CS's report and the need to carry ten pounds of drugs. Jimenez was not simply traveling along the street, like a tourist, adjacent to the parking lot. Rather, he left the sidewalk in order to enter the parking lot, and paced back and forth along the length of the parking lot for several minutes, as though waiting for someone. The CS therefore predicted facts which the police were able to use to corroborate his information. Importantly, Jimenez was seen in the parking lot making a call, and the CS took a call reportedly from him at the same moment to confirm that he had arrived at the parking lot. The CS told Jimenez that he was "hung up," which the Court understands means that the CS was telling Jimenez that he was going to be late to the meeting. Withing a minute or two, Jimenez began to depart the meeting place. It is a reasonable inference that Jimenez departed because the purpose of the meeting had been frustrated by the CS's inability to meet Jimenez.

Of course, there are many innocent reasons why a person might be in the parking lot, especially in a "24 hour" city like Las Vegas. *Terry* contemplates the resolution of such ambiguities during the stop. In *Adams v. Williams*, the Supreme Court explained its holding in *Terry* as follows:

> In *Terry*, this Court recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there was no probable cause to make an arrest. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be

1    most reasonable in light of the facts known to the officer at the time.

2    407 U.S. at 145-47 (internal quotations and citations omitted).  A valid stop can include the

3    momentary restriction on a person's freedom of movement to maintain the status quo while making

4    an initial inquiry.  *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981).  Otherwise, an

5    officer could not perform a preliminary investigation of an alleged wrongdoing.  *United States v.*

6    *Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).  In cases where "the conduct justifying the stop was

7    ambiguous and susceptible of an innocent explanation . . . *Terry* recognized that the officers could

8    detain the individuals to resolve the ambiguity."  *Wardlow*, 528 U.S. at 125.  This was such a case.

9    The Court has no difficulty finding reasonable suspicion to stop Jimenez in the parking lot for

10   further investigation.

11          Even if Jimenez had simply gone about his business, and walked back down Tropicana

12   Avenue from the direction he had come, the officers could have temporarily detained him under

13   *Terry* to further investigate the suspected crime.  But when police approached him and he ran,

14   Jimenez was not simply going about his business.  As the Supreme Court has said, "Flight, by its

15   very nature, is not 'going about one's business;' in fact, it is just the opposite." *Id.*  The Court finds

16   that a reasonably prudent person evaluating Jimenez's attempt to flee, in combination with other

17   facts then known, would have concluded that there was a fair probability that Jimenez was in

18   possession of illegal narcotics.  At that point, officers lawfully arrested Jimenez without a warrant

19   in a public place for a felony in a manner consistent with the Fourth Amendment because it was

20   supported by probable cause.

21          Jimenez argues the Declaration of Arrest written by Detective Donaldson said that Jimenez

22   was arrested for violating "trespassing or obstruction of justice laws" in the officers' presence, and

23   that the officers could not reasonably have believed that they had probable cause to arrest Jimenez

24   for those offenses.  The Government did not address this issue, but the Court finds it to be a moot

25   point.  As long as there is an objective basis to support probable cause, the stop is reasonable under

26   the Fourth Amendment, regardless of the arresting officer's state of mind.  *Whren v. United States*,

27   517 U.S. 806, 819 (U.S. 1996).  The Court has found that there was an objective basis to support

28   probable cause.

Jimenez argues that Detective Donaldson was not a credible person because his Declaration of Arrest, written after the arrest, was vague and omitted several important facts, for example, that Jimenez would arrive on foot wearing a red shirt, and carrying a black bag. Additionally, the Declaration omitted reference to suspect Jose C., although he was the possible suspect in the transaction and whose photograph was provided to the surveillance team during the pre-operation brief, failed to state the precise amount of drugs to be delivered, and did not identify the precise location of the transaction. Jimenez argues that the deficiencies in the Declaration were the result of the CS being inaccurate and unreliable, and that Detective Donaldson's testimony should not be believed.

The Court finds Detective Donaldson to be a credible witness. He testified based upon his observations and appeared to have good recollection of the facts, conceded those issues which he could not recall, demonstrated no bias against the defendant, and his testimony was reasonable in light of the other testimony adduced at the hearing. It is true that the Declaration of Arrest was vague and somewhat incomplete as to many details. Detective Donaldson reasonably explained that the Declaration is only a summary of the evidence, and need not contain all of the details to support the arrest. Under the circumstances here, it is of no importance that Jose Jimenez, rather than Jose C., was the person who actually attempted to deliver the drugs. The Court considered the shortcomings of the Declaration, as highlighted by Jimenez, but does not find them to be dispositive as to Detective Donaldson's credibility. Nor is the Court persuaded that because Detective Donaldson did not recall that he had used Jimenez's cell phone after the arrest to determine the carrier and number, that his testimony is not credible. He admitted he did not recall, and was mistaken. The Court therefore concludes that there was probable cause to arrest Jimenez after he attempted to flee, and the motion to suppress is denied.

## C. *Miranda* Warnings After Arrest and Cell Phone Evidence

In his Supplement, Jimenez argues, for the first time, that the statements that he made to Officer Clatterbuck when he was first taken into custody, indicating he had drugs in his pockets, should be suppressed because Jimenez did not receive *Miranda* warnings. The Government objects to the untimely motion, but responds that it does not intend to introduce those statements, or the

drugs found in Jimenez's pockets, because he is not charged with those offenses. Based upon the Government's representations, it may not introduce at trial evidence of the drugs found in Jimenez's pockets, or his admissions about the drugs.

Similarly, in his Supplement, Jimenez argues for the first time that any evidence seized from his cell telephone be suppressed. Because it was unclear to the Court whether the Government intended to present evidence regarding the cell phone contents and phone number at trial, on September 29, 2016, the court conducted an additional hearing on that issue. (*See* Order (ECF No. 34); Minutes (ECF No. 35).) At the hearing, the Government indicated that although it would introduce evidence that a cell phone was seized incident to Jimenez's arrest, it did not intend to introduce evidence of the cell phone number or its contents. Based upon the Government's representations, unless it notifies the Court otherwise (thereby triggering the ability of Jimenez to renew his motion), the Government may not introduce evidence of the telephone number or contents of Jimenez's cell phone.

### III.  RECOMMENDATION

Accordingly, **IT IS HEREBY RECOMMENDED** that Jimenez's Motion to Suppress (ECF No. 18) be **DENIED**.

### NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the District Court's Order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: October 3, 2016

**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

11